El Juez Asociado Sr. Wolf, no intervino en la resolución de este caso.

---

## CINTRÓN *v.* EL BANCO TERRITORIAL Y AGRÍCOLA.

## APELACIÓN procedente de la Corte de Distrito de

## San Juan.

No. 49.—Resuelto en Junio 24, 1905.

OBLIGACIONES.—CONFUSIÓN DE DERECHOS.—EXTINCIÓN DE LA OBLIGACIÓN.—Para que la confusión de derechos pueda ser alegada con éxito en oposición á una demanda ejecutiva, es necesario que haya tenido lugar en relación con la obligación que le sirva de fundamento, y que ésta haya quedado extinguida por virtud de tal confusión, la que no ejercerá influencia alguna en este sentido si se hubiere verificado en relación con una obligación distinta é independiente de aquélla.

ID.—EXIGIBILIDAD DE LAS OBLIGACIONES.—Toda deuda cierta, líquida y vencida, es perfectamente exigible en derecho.

HIPOTECA.—PROCEDIMIENTO EJECUTIVO.—CÉDULAS HIPOTECARIAS.—TENEDORES DE CÉDULAS.—Las cédulas hipotecarias del Banco Territorial y Agrícola de Puerto Rico son documentos al portador, y á los tenedores de las mismas no les son aplicables las disposiciones del apartado último del art. 171 del Reglamento Hipotecario, ni el apartado segundo del art. 172 del mismo Reglamento.

ID.—EDICTOS ANUNCIANDO LA SUBASTA.—Los edictos anunciando la subasta á que se refiere el artículo 172 del Reglamento para la ejecución de la Ley Hipotecaria, deberán expresar el sitio en que ha de celebrarse, y dicha subasta no podrá tener lugar en otro punto distinto de aquél que se haya fijado, so pena de nulidad.

ID.—La fórmula ordinaria que suelen emplear los Tribunales para señalar el sitio de una subasta, de que *ésta se verificará ante el Tribunal que autoriza los edictos,* es admisible en los casos en que un Tribunal ejercita la plenitud de su jurisdicción solamente en la cabecera del Distrito, no sucediendo lo propio cuando el ejercicio de esa jurisdicción puede tener lugar en otros puntos.

ID.—NÚMERO DE SUBASTAS QUE PUEDEN CELEBRARSE.—El art. 127 de la Ley Hipotecaria, en cuanto se refiere á una sola subasta, ha sido derogado por disposiciones posteriores de la misma Ley y de su Reglamento, que autorizan la celebración de más de una subasta en las ejecuciones para cobro de créditos hipotecarios.

ID.—NULIDAD DE LA SUBASTA.—NULIDAD DE ADJUDICACIÓN.—La nulidad de una subasta lleva consigo la nulidad de la adjudicación y demás actos que de ella se deriven.

ID.—ADJUDICATARIO.—DAÑOS Y PERJUICICS.—ABONO DE LOS FRUTOS.—La nulidad de una subasta, no motivada por dolo, sino por una errónea apreciación jurídica, no puede servir de base á una reclamación de daños y perjuicios contra el aujudicatario, quien queda convertido por razón de tal nulidad, en un mero administrador de los bienes adjudicados y como tal obligado tan solo al abono de los rendimientos producidos y debidos producir durante su posesión de la finca como tal adjudicatario.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Guzmán Benítez (Juan)*

Abogado del apelado: *Sr. Guzmán Benítez (José)*.

EL JUEZ ASOCIADO SR. HERNÁNDEZ, emitió la opinión del tribunal.

Por escritura pública otorgada en esta ciudad de San Juan con fecha 29 de abril de 1895, la sociedad agrícola "Cintrón Hermanos," establecida en el pueblo de Yabucoa y constituída por don José Facundo, don Zoilo, doña Margarita y doña Eulalia Cintrón, consortes éstas respectivamente de don Mariano Martorell y don Aurelio Dapena, reconoció deber al Banco Territorial y Agrícola de Puerto Rico la cantidad de noventa mil pesos mexicanos, equivalentes á ochenta y cinco mil quinientos pesos provinciales, que con sus intereses al nueve por ciento anual, acumulados al capital, con arreglo á las tablas de amortización del Banco, se obligó á satisfacerle en sus propias oficinas, y en oro ó plata acuñados, de curso legal en la provincia el día del pago, en veinte anualidades, divididas en cuarenta semestres iguales, á excepción del último, por haberse deducido de éste un semestre anticipado de sus intereses, importando cada uno de los 39 primeros semestres de amortización 4,683 pesos nueve centavos moneda provincial, vencederos en los días 30 de octubre de 1895, 30 de abril y octubre de los años de 1896 al 1914 inclusive, y el último semestre 835 pesos cincuenta y nueve centavos, moneda provincial, vencedero el 30 de abril de 1905. Estipulóse en dicha escritura, que si vencían dos plazos y no eran oportunamente satisfechos, se entendería vencida toda la deuda pendiente,

quedando el Banco en aptitud de cobrarla con sus intereses, costas y gastos que en la cobranza se originaran y comisión del uno por ciento, convenida para los casos de pago anticipado, habiendo hipotecado la referida sociedad á la seguridad del pago de la deuda é intereses, con más 2,000 pesos para los nuevos réditos de los semestres y premios del seguro que no se pagaran á su vencimiento, y otros dos mil pesos más para costas y pagos anticipados, la hacienda de cañas ó Ingenio Central de fabricar azúcar denominado "Laura," sito en el barrio de Limones, del término municipal de Yabucoa, con cabida de 491 cuerdas 56 centavos de otra, y otros terrenos anexos á dicho Ingenio, cuales son, un predio rústico con cabida de 440 cuerdas veinte y ocho centavos de otra, conocido con los nombres de "Cercado Diamante" y "Dos Ríos", y otra extensión de terreno, con cabida de 231 cuerdas y 42 céntimos de otra, denominada "Palmarejo" y "Margarita", á todos cuyos terrenos se señalaron las responsabilidades en metálico á que quedaban afectos.

Por otra escritura de 4 de agosto de 1899, la sociedad Cintrón Hermanos, reconoció adeudar al Banco Territorial y Agrícola, procedente de los plazos 5o., 6o., 7o. y 8o. de la escritura hipotecaria de 29 de abril de 1895 y de otros suplementos, un saldo vencido de $12,696.21 moneda provincial, según liquidación que practicaron en 30 de junio del expresado año de 1899, y convinieron además las partes en un préstamo de 10,000 pesos en cédulas hipotecarias á la par, con el interés de 9 por ciento anual, de cuyo préstamo recibieron Cintrón Hermanos 5,000 pesos, obligándose el Banco á entregarles los 5,000 restantes, en octubre del propio año. Para garantizar el pago de los 12,696 pesos 21 centavos, y el de los 10,000 pesos, ambas sumas con sus intereses, Cintrón Hermanos hicieron entrega y trasmitieron al Banco todo

el azúcar á producirse por la plantaciones de cañas dulces del Ingenio "Laura" y terrenos anexos.

Por escritura posterior de 16 de noviembre de 1899, confesaron Cintrón Hermanos haber recibido los 5,000 pesos pendientes del préstamo hecho por la de 4 de agosto del mismo año, y además $15,000 moneda corriente, en cédulas hipotecarias, para reedificar los edificios de la Central "Laura" destruídos por el ciclón de "San Ciriaco." Para garantizar el pago del saldo de los 12,696 pesos 21 centavos á que se refiere la liquidación de 30 de junio de 1899, el del préstamo de los 10,000 pesos y el de los 15,000 pesos para reedificación de los edificios del Ingenio "Laura," con los intereses de todas esas cantidades al 9 por ciento anual, los deudores afectaron varios valores, entre éstos, la propiedad ya trasmitida al Banco de las plantaciones de cañas de la Central "Laura," sus retoños y nuevas siembras, todos los productos de las mismas, incluso la parte de los medianeros, los tres kilómetros de vía férrea, los 110 wagones, los carros, otros enseres de la finca, y el derecho de adquirir la propiedad de 200 bueyes dados en garantía á González y Alonso para responderles de cantidades que el Banco podría pagar por cuenta de Cintrón Hermanos.

Por documento privado de 17 de marzo de 1900, quedó cancelado el préstamo de 10,000 pesos, se abonaron 1,567 pesos 50 centavos en cédulas hipotecarias, á la cuenta de reparaciones de la Central "Laura" y el Banco entregó á Cintrón Hermanos 18,887 pesos en préstamo, con intereses recíprocos al 9 por ciento anual y comisión del 4 por ciento mensual á favor del Banco. Con parte de esa última suma se pagaron á González y Alonso las obligaciones de Cintrón Hermanos, de que respondían los 200 bueyes de la Central "Laura", pasando la propiedad de éstos, en virtud de lo convenido, á formar parte de las garantías dadas al Banco, pues se estipuló

que, sin perjuicio de la cancelación del préstamo de los 10,000 pesos, todas las demás cantidades adeudadas al Banco, continuarían garantizadas con las plantaciones de cañas dulces, sus retoños, nuevas siembras y sus productos, bueyes, vía férrea, wagones, carros y demás mue bles y enseres de la Central "Laura."

Por escritura pública de 19 de mayo de 1900, el Banco Territorial y Agrícola y Cintrón Hermanos celebraron otro contrato de préstamo hipotecario por la cantidad de 12,000 dollars, á pagar dentro de dos años, con interés del nueve por ciento anual, pagaderos por anualidades vencidas, constituyendo á favor del Banco una segunda hipoteca sobre la hacienda "Laura" y fincas á ella anexas, cuya escritura había de ser presentada en el Registro de la Propiedad y entregada inscrita al Banco por la sociedad deudora, dentro del término de 20 días, con una certificación del Registro en que se inserte su inscripción y conste que sobre las referidas fincas no existen más cargas que la primera y segunda hipoteca á favor del Banco.

De los documentos expresado, sólo obran testimoniadas en autos las dos escrituras hipotecarias de 29 de abril de 1895 y 19 de mayo de 1900, si bien de los demás se hace referencia en otra escritura de 23 de mayo citado.

Merece consignarse que en el hecho 8 de esa escritura de 23 de mayo de 1900, se hizo constar que el Banco y Cintrón Hermanos habían practicado en 17 del mismo mayo una liquidación de las acreencias no hipotecarias que tenía el Banco Territorial y Agrícola contra Cintrón Hermanos, de cuya liquidación resultó que la referida sociedad adeudaba al Banco la suma de 49,170 pesos 57 centavos, moneda provincial, que las partes reducen y fijan en su equivalencia de 29,502 pesos 34 centavos oro americano.

También se hizo constar en el hecho noveno de la an-

tedicha escritura de 23 de mayo, que á cuenta de la deuda total de 29,502 dollars 34 centavos á que ascendía la liquidación practicada en 17 de mayo de 1900, Cintrón Hermanos depositaron en la Caja del Banco 9,325 dollars 44 centavos para que se les abonaran definitivamente tan pronto entregaran al Banco la primera copia inscrita de la escritura de segunda hipoteca de 19 de mayo de 1900, con la certificación de su inscripción en el Registro, después de cuyo abono el capital de la deuda quedaría reducido á 21,176 dollars 90 centavos.

Aparece también consignado en el hecho 10 de la escritura de 23 de mayo de 1900, que el escaso producto que para la cosecha de aquel año indicaban el Ingenio Central "Laura" y fincas á él anexas, y las dificultades de dar á los trabajos del mismo el impulso necesario para obtener el mayor rendimiento posible, habían demostrado á Cintrón Hermanos la imposibilidad en que se encontraban de cumplir sus compromisos con el Banco, por lo cual, y para cumplir parte de ellos, no sólo solicitaron el préstamo hipotecario de 12,000 dollars á que se refiere la escritura de 19 de mayo 1900, sino que encontrándose vencido el otro crédito hipotecario constituído en la de 29 de abril de 1895, por encontrarse insolutos sus plazos 9 y 10, habían ofrecido al Banco renunciar todos los derechos que pudieran caberles, en virtud de la suspensión de los procedimientos para el cobro de préstamos hipotecarios, tanto los acordados en las Ordenes Generales de 19 y 31 de enero de 1899, como los que pudieran deducirse de cualquiera otra disposición análoga del Gobierno, la Legislatura, ó de cualquier otro origen, *á fin de que, si el Banco lo cree conveniente á sus intereses, pueda tomar la administración de la finca por convenio privado ó judicialmente, cultivándola, elaborando las cosechas de sus cañas existentes y las demás que siembre, y las de los medianeros, aparceros, y*

*colonos, dedicando sus productos de todas clases*
*á reembolsarse de los gastos que le ocasione la adminis-*
*tración, y de los intereses, premios del seguro y capital*
*pendiente de la relacionada primera hipoteca de 29 de*
*abril de 1905.*

Según el hecho 11 de la repetida escritura de 23 de
mayo de 1900, para pagar Cintrón Hermanos al Banco
los 21,176 dollars 50 centavos que resultaron adeudarle
de la liquidación de cuentas no hipotecarias practicada
en 17 de mayo de 1900, después de hecho el abono defi-
nitivo de la suma de 8,325 dollars 44 centavos depositada
con ese objeto, solicitaron del mismo Banco la concesión
de dos créditos, uno de nueve mil dollars, que garanti-
zarían con los 200 bueyes, tres kilómetros de vía férrea,
los 110 wagones, enseres, útiles y demás aperos de la-
branza del Ingenio Central "Laura", *y el otro de 12,176*
*dollars 90 centavos que agarantizarían con los frutos ela-*
*borados, plantaciones hechas y por hacer en la Central*
*"Laura" y los productos de las cosechas de 1900 y de*
*1901 á 1902, inclusos los productos que correspondan á*
*dicho Ingenio por cañas de sus medianeros, aparceros y*
*colonos, tomando á su cargo el Banco para hacer efec-*
*tiva esa garantía la administración del Ingenio Central*
*"Laura" y fincas á él anexas.*

Para formalizar ambos contratos de préstamo, fué
otorgado por Cintrón Hermanos y el Banco Territorial
y Agrícola, la escritura de 23 de mayo de 1900, la que
después de consignar los hechos expuestos, contiene como
cláusulas principales las que se transcriben á continua-
ción:

"Primera.—La sociedad agrícola Cintrón Hermanos, confiesa
haber recibido en esta fecha, aunque antes de este acto, del Banco
Territorial y Agrícola de Puerto Rico, la suma de 9,000 dollars
oro americano, que se obligan á pagarle, así como sus intereses re-
cíprocos al nueve por ciento anual, dentro del término de un año,
á contar desde hoy; pero este término se considerará vencido, y el

Banco podrá exigir, desde luego, el pago del capital é intereses, si el Ingenio Central "Laura," y fincas á él anexas fuesen vendidas, adjudicadas ó arrendadas á terceras personas ó al mismo Banco, cualquiera que fuese la causa que motivare su trasmisión ó arrendamiento.—Segunda.—La misma Sociedad Agrícola Cintrón Hermanos, y á su voz y nombre su gestor y administrador Don Aurelio Dapena y Moreno, confiesa haber recibido del Banco Territorial y Agrícola de Puerto Rico, también en esta fecha, aunque antes de ese acto, la suma de 12,176 dollars, 90 centavos, oro americano, que se obliga á pagarle, así como sus intereses al 9 por ciento anual recíprocos, dentro de un término que no excederá del día quince de julio del corriente año, que se señala para su vencimiento. —Tercera.—La obligación de pago de los nueve mil dollars oro americano, contraída en la cláusula primera, queda garantizada con los doscientos bueyes, tres kilómetros de vía férrea, los 110 wagones, los carros, útiles, aperos y enseres de labranza y cultivo, ya trasmitidos al Banco por contratos anteriores y correspondientes al Ingenio Central "Laura", y que ahora de nuevo, á los efectos de la presente garantía, la sociedad Cintrón Hermanos trasmite al propio Banco, sin ninguna reservación, entendiéndose que mientras no queden totalmente canceladas las obligaciones del pago del expresado capital y de sus intereses, todos esos bienes se considerarán especialmente afectos á su solvendo, y para el caso de su realización ó venta, de común acuerdo, las partes los tasan á razón de 40 dollars cada buey, 2,000 dollars los tres kilómetros de vía férrea, 20 dollars cada wagón, y convienen que los carros y útiles, aperos y enseres de labranza, serán tasados por dos peritos nombrados por las partes, según los trámites del procedimiento de apremio en el juicio ejecutivo de la Ley de Enjuiciamiento Civil.—Cuarta.—La obligación del pago de los 12,176 dollars, 90 centavos, y de sus intereses, contraída por Cintrón Hermanos en la cláusula segunda, la garantizan con las plantaciones de cañas dulces de la Central "Laura" y fincas anexas, ya trasmitidas al Banco por convenios anteriores, y con los frutos elaborados y á elaborar, retoños y nuevas siembras para la próxima cosecha, y frutos y productos de todas clases que tanto en esta cosecha como en la entrante de 1901 á 1902 correspondan al Ingenio Central "Laura" por plantaciones propias ó por su partición con medianeros, aparceros y colonos; á ese fin, Cintrón Hermanos trasmiten y entregan desde ahora al Banco Territorial y Agrícola de Puerto Rico dichas plantaciones, siembras, retoños, frutos y productos, y el Banco conservará íntegra-

mente su propiedad mientras no sean canceladas totalmente las referidas obligaciones por capital é intereses, y podrá ejercer todos los derechos y tomar todas las medidas que respecto á las plantaciones, frutos y productos del Ingenio Central "Laura" tiene reconocidos por los pactos de las escrituras de 4 de agosto y 16 de noviembre de 1899, relacionadas en los hechos ó números 5 y 6 de la presente.—Quinta.—La sociedad Cintrón Hermanos se constituye depositaria de los bienes, plantaciones, siembras, frutos y productos elaborados y á elaborar y valores comprendidos en las garantías todas y trasmisiones hechas, obligándose á tenerlos todos á disposición del Banco y á entregárselos cuando éste se lo exija, bajo las penas y responsabilidades establecidas por el artículo 559 de la Ley de Enjuiciamiento Civil; y en cuanto á la conservación y realización en su caso, de esos bienes y valores, Cintrón Hermanos se someten expresamente á las reglas contenidas en los artículos 39, 40 y 41 de los Estatutos del Banco, de las que están perfectamente informados.—Sexta.—Para realizar el pago de los 12,176 dollars 90 centavos, oro americano, de la obligación contraída en la *cláusula 2da. y el de sus intereses, la Sociedad Agrícola Cintrón Hermanos, y en su nombre y en su representación Don Aurelio Dapena y Moreno, entrega al Banco Territorial y Agrícola de Puerto Rico, y éste recibe la administración y dirección del Ingenio Central "Laura," y fincas ó terrenos á él anexos, y en consecuencia, el Banco venderá los frutos y productos de la finca con abono á la cuenta de ese crédito; y con cargo á ella y hasta donde lo crea conveniente hará los gastos que estime necesarios para el sostenimiento de los cultivos y plantaciones y el de su elaboración para convertirlos en productos realizables.*—Séptima.—Es convenio que con cargo á la cuenta de la administración del Ingenio Central "Laura," el Banco satisfará á los Sres. De Ford y Compañía las obligaciones pignoraticias que les adeudan Cintrón Hermanos y son: una de 6,768 pesos provinciales á vencer el 26 de junio entrante, y otra de 3.750 pesos provinciales, garantizadas, respectivamente, con 188 cédulas hipotecarias de la segunda emisión del Banco, y 50 cédulas de la misma clase de su 5a. emisión, y al recibir las cédulas pignoradas las abonará á la misma cuenta por todo su valor nominal por la parte vencida que tuvieren del cupón corriente.—Octava.—Sobre todos los productos y frutos, cuya venta ó realización hiciera el Banco como indemnización por su gestión administrativa, percibirá una comisión del 2 por ciento.—Novena.—Las partes, de mutuo acuerdo, practicarán un inventario del Ingenio "Laura" y fincas anexas al

mismo, comprendiendo en él los bienes y valores dados en garantía al Banco, el que firmarán y servirá de norma á los efectos de este contrato, especialmente en lo que respecta á las responsabilidades de sus depositarios Cintrón Hermanos y conocimiento de los bienes entregados en administración al Banco.—Décimo.—A los efectos que corresponden en su oportunidad, declaran los Sres. Cintrón Hermanos, que no les conviene acogerse á las disposiciones vigentes sobre suspensión del cobro del capital de préstamos hipotecarios sobre fincas rústicas, y en consecuencia, hacen la más formal y solemne renuncia de los derechos que puedan derivarse de esas disposiciones ó de cualesquiera otras de naturaleza análoga que pudieran dictarse, sea el que fuere su origen; *de manera que si el Banco acreedor pidiese la administración de la finca Central "Lahra" y de las demás á ésta anexas, para cobrarse de la primera hipoteca que está vencida toda por no haberse satisfecho sus plazos 9 y 10 vencidos, pueda tomar la administración de la referida finca para cobrar, no solamente los intereses decaídos y á decaer, sino también todo el capital pendiente de pago, gastos y costas.*—Undécima.— *Los Señores Cintrón Hermanos prestarán su conformidad ó reparos justificados á las cuentas de gastos de la administración de la finca de que se ha hecho cargo el Banco, en las oficinas de éste, cada 30 días á contar desde hoy y se obligan para el caso de no formular sus reparos en los términos expresados, ó conformarse, estar y pasar por el resultado de la contabilidad del Banco.*—Duodécima.— Los deudores Cintrón Hermanos podrán satisfacer en cualquier tiempo las sumas que actualmente adeudan al Banco y las que en adelante le adeudaren á consecuencia del presente contrato, con sus intereses, costas y gastos hasta el día del pago, y hecho esto, podrán disponer libremente de los bienes y valores afectos á la responsabilidad de la suma pagada, si con ella quedase cancelada totalmente la obligación garantizada.—Décima tercera.—Para todos los actos, notificaciones, citaciones, reclamaciones y diligencias judiciales y las extrajudiciales ó privadas que se deriven del presente contrato, el Banco podrá entenderse y dirigirse á uno cualquiera de los socios, gestores ó administradores de la sociedad agrícola Cintrón Hermanos; en caso de su disolución, á sus liquidadores ó á cualquiera de sus causahabientes ó condueños de las fincas, ó parte obligada al pago de las deudas, pues á este efecto, Cintrón Hermanos renuncian el derecho de ser requeridos ó notificados todos personalmente é imponen á sus sucesores, derecho y causahabientes, la obligación de dar como practicadas con todos

ellos las notificaciones, citaciones, reclamaciones y diligencias que se hicieren á uno solo; y para todas ellas, privadas ó judiciales, y demás efectos de la presente escritura, las partes otorgantes se someten desde ahora, expresamente á los Tribunales de esta ciudad de San Juan, creados por la Orden General número 118, serie de 1899, ó á los que le sustituyan.—Décima cuarta: Todos los gastos y honorarios del presente documento y de su copia, y cuantos más del mismo se deriven, serán de cuenta y á cargo de Cintrón Hermanos, pues el Banco, en ningún caso, habrá de sufragar gasto alguno, pues ha de percibir en toda su integridad las sumas que se le adeudan, con sus intereses convenidos libres de gastos y costas.—Décima quinta: El Banco Territorial y Agrícola de Puerto Rico, y en su representación, su director gerente Don Vicente Antonetti y Antonini, declara que con el depósito de los 8,325 dollars cuarenta y cuatro centavos de que trata el hecho noveno de esta escritura, y con el importe de los dos créditos concedidos á los Señores Cintrón Hermanos, éstos han satisfecho al Banco los 49,170 pesos cincuenta y siete centavos moneda provincial, equivalentes á 29,502 pesos 34 centavos oro americano, total de las liquidaciones de cuentas no hipotecarias que practicaron el día 17 de los corrientes y que se han relacionado en el hecho 8o., y por tanto, otorga formal carta de pago á los Sres. Cintrón Hermanos de la suma que le han satisfecho, aunque dejándola pendiente, en cuanto á la cantidad del depósito, de su abono definitivo, cuando se cumpla la obligación de entregar los documentos de que trata el hecho 9.''

Así las cosas, con fecha 30 de septiembre de 1902, el Banco Territorial y Agrícola, representado por el letrado don Juan de Guzmán Benítez, presentó ante el Tribunal de Distrito de Humacao, contra la sociedad agrícola Cintrón Hermanos, demanda ejecutiva, con arreglo al procedimiento que autorizan la Ley Hipotecaria y su Reglamento, con súplica de que la referida sociedad fuera requerida para que en el término de 30 días, pagara al Banco ejecutante $58,103.82, que por la hipoteca constituída en la escritura de 29 de abril de 1895 adeudaba por capital y premios del seguro, intereses de esas sumas hasta el 25 de septiembre citado, y comisión de pago anticipado convenido en dicha escritura, así como los nue-

vos intereses que al mismo tipo de 9 por ciento anual devengaran el capital y premios del seguro, desde la antedicha fecha hasta el día del pago, las nuevas renovaciones del seguro con sus intereses que por el mismo concepto tuviese que pagar el Banco, y el importe de todos los gastos, costos y costas que con motivo de la hipoteca se causaren al Banco acreedor, apercibidos Cintrón Hermanos de que los bienes hipotecados se sacarían á pública subasta por el precio fijado en el contrato, si no verificaban el pago.

Alegó el Banco, en apoyo de su demanda, las estipulaciones consignadas en la escritura hipotecaria de 29 de abril de 1895, y explicó que Cintrón Hermanos pagaron los ocho primeros plazos semestrales de la deuda, cuya parte de capital importa 7,986 pesos 78 centavos provinciales, que deducidos de los 85,500 pesos provinciales, equivalentes á la suma prestada, dejaron reducida la deuda del capital á 77,513 pesos 22 centavos provinciales, que por el quebranto del canje por oro equivalen á 46,507 dollars 93 centavos, valor en 30 de abril de 1899, que fué la fecha en que venció el 8 y último plazo satisfecho; que por no haber pagado los deudores en su oportunidad, hubo el Banco de satisfacer por su cuenta las cantidades de 306 pesos 64 centavos en 8 de octubre de 1900, y 313 pesos 74 centavos en 7 de octubre de 1901, por renovaciones de los premios del seguro; que después del 8o. semestre de la hipoteca vencieron seis plazos semestrales más en 30 de octubre de 1899, 30 de abril y octubre de 1900 y 1901 y 30 de abril de 1902, sin que fueran satisfechos, habiendo vencido toda la deuda del capital pendiente desde que vencieron los dos primeros de dichos seis plazos insolutos: que liquidados hasta el 25 de Septiembre de 1902 los intereses convenidos al 9 por ciento anual sobre los 46,507 pesos 93 centavos de capital, desde 30 de abril de 1899, sobre los 306.64 del

seguro desde el 8 de octubre de 1900 y sobre los 313 también del seguro desde el 7 de octubre de 1901, y agregados los $46,508 del uno por ciento convenido por comisión de pago anticipado sobre el capital pendiente, según lo convenido en la escritura, se obtiene como resultado la cantidad de 61,931 pesos 20 centavos, moneda americana, valor al 25 de septiembre de 1902, de cuya suma hay que deducir la cantidad equivalente á 2,308 pesos 50 centavos, moneda americana, que al formalizar el préstamo abonaron los deudores en concepto de intereses anticipados, y los intereses de dicha suma hasta el 25 de septiembre de 1902, al mismo tipo del 9 por ciento, cuyos intereses ascienden á $1,518.88 centavos, quedando á favor del Banco un saldo de $58,103.82, moneda americana, que es la cantidad á que se refiere el requerimiento solicitado, distribuída en la forma siguiente: Capital pendiente del préstamo de $46,507.92. Premios del seguro pagados por el Banco, $620.38. Intereses al 9 por ciento sobre ambas sumas liquidadas hasta el 25 de septiembre de 1902, $10,510.43. Comisión de pago anticipado, $465.08. Total, $58,103.82, á cuyo pago debía ser requerida la sociedad demandada, cuya sociedad debía, además, abonar en su oportunidad, desde el 25 de septiembre de 1902, hasta el día del pago, los nuevos intereses que se devengaran, al mismo tipo del 9 por ciento anual, sobre la cantidad del capital y de los premios del seguro que hubiesen de pagarse con sus intereses, y las costas causadas y que se causaran hasta la terminación del procedimiento de apremio.

También expresó el Banco en su demanda que la sociedad Cintrón Hermanos, por escritura pública de 19 de mayo de 1900, se obligó á satisfacerle la cantidad de 12,000 dollars, que pagaría con sus intereses al 9 por ciento anual dentro del plazo de dos años, á vencer en 19 de mayo de 1902; habiéndose convenido que si llegaba

esa fecha sin pagar capital é intereses, la suma total de éstos y aquél devengaría también interés de mora al tipo de 9 por ciento anual, y para garantía de la devolución del capital prestado, del pago de sus intereses, de los de mora del capital é intereses, y de las costas y gastos, daños y perjuicios hasta mil dollars, Cintrón Hermanos hipotecaron á favor del Banco las mismas fincas anteriormente hipotecadas, sin que tampoco hubiera sido satisfecho ese crédito, que con sus intereses hasta el 19 de mayo de 1902, según rectificación hecha en escrito posterior, representaba 14,160 dollars, á los que debían agregarse 450 dollars 46 centavos, en concepto de intereses de mora, hasta el 25 de septiembre de 1902, resultando en esa fecha un total líquido de 14,610 dollars 46 centavos, cuya circunstancia se hacía constar por sí en el curso del ejecutivo, ofrecía el Banco por los bienes hipotecados el importe de ese crédito, además de la primera hipoteca que servía de base á la ejecución.

La Corte de Distrito de Humacao, por auto de 10 de octubre siguiente, accedió al requerimiento de pago en los términos solicitados por el Banco Territorial y Agrícola, y ese requerimiento se hizo en 20 del citado octubre á don Mariano Martorell, quien expresó que no había sido, ni era, gestor de la sociedad agrícola Cintrón Hermanos, y que no existía gestor, porque la hacienda "Laura" se encontraba bajo la administración del Banco Territorial y Agrícola; habiéndose hecho igual requerimiento en 3 de noviembre siguiente á doña Margarita Cintrón, asistida de su legítimo esposo don Mariano Martorell, los que manifestaron que protestaban de la ejecución para hacer valer sus derechos oportunamente y cuando les conviniera.

A instancia del Banco Territorial y Agrícola, la Corte de Humacao, por auto de 18 de diciembre de 1902, or-

denó se pusieran en pública subasta los bienes hipote-
cados por término de veinte días y por el valor fijado
en el contrato, anunciándose la subasta por edictos que
se publicarían en el periódico "The Porto Rico Sun"
y se fijarían en los parajes públicos del lugar donde
radican dichos bienes y en los sitios acostumbrados de
la ciudad de Humacao, con expresión en los edictos de
que no se admitirían posturas que no cubrieran las dos
terceras partes del tipo señalado para la subasta, que
los licitadores debían consignar previamente en la mesa
del Tribunal el 10 por ciento del valor de los referidos
bienes, y que deberían conformarse con los títulos de
propiedad, de los que se haría mención en los edictos,
con arreglo á lo que resultara de la escritura de hipoteca,
habiéndose señalado para el remate el día 22 de febrero
de 1903 á la hora de las dos de la tarde.

El edicto anunciando la subasta de los bienes hipote-
cados se publicó en el número 310 del periódico "El He-
raldo Español" de Puerto Rico, correspondiente al día 30
de diciembre de 1902, y se fijó en el pueblo de Yabucoa y
en el sitio de costumbre de la ciudad de Humacao, por tér-
mino de veinte días, describiéndose en él los bienes, tales
como aparecen en el título ejecutivo, consignándose el va-
lor dado á cada finca, y expresándose además que el rema-
te se celebraría en 22 de enero de 1903 ante el Tribunal de
Distrito de la ciudad de Humacao, que las posturas de-
bían cubrir las dos terceras partes del avalúo, y que los
licitadores habían de consignar previamente el diez por
ciento del mismo.

En la fecha señalada, 22 de enero de 1903, se celebró en
Humacao la subasta anunciada, sin que se presentara
postor alguno, y á instancia del Banco Territorial y Agrí-
cola de fecha del día siguiente, la Corte de Humacao, por
auto de 13 de febrero de 1903, ordenó se sacaran por se-
gunda vez á pública subasta por término de veinte días y

con rebaja del 25 por ciento de avalúo, las fincas hipotecadas, anunciándose esa subasta con las mismas formalidades que la anterior y señalando para el remate el día 17 de marzo á las dos de la tarde.

Dicha subasta fué anunciada en el periódico "El Heraldo Español," de Puerto Rico, número 41 correspondiente al 18 de febrero citado, en el pueblo de Yabucoa, y en el sitio acostumbrado de la ciudad de Humacao por término de veinte días, llenando los edictos las mismas formalidades que los de la anterior subasta, y expresándose en ellos que el acto tendría lugar ante el Tribunal de Humacao el día 17 de marzo, y que no se admitirían posturas que no cubrieran las dos terceras partes de la cantidad fijada como tipo para dicha segunda subasta.

Esa segunda subasta se celebró en Guayama en el día y hora señalados, sin que concurriera al acto postor alguno.

Al día siguiente, 18 de marzo, la representación del Banco Territorial y Agrícola presentó escrito á la Corte de Humacao solicitando se le adjudicaran los bienes subastados por las dos terceras partes del precio que sirvió de tipo á la segunda subasta, ó sea por la suma de 67,253 dollars cinco centavos, que representaban las dos terceras partes de 100,879 dollars 57 centavos á que quedaban reducidos los 134,506 dollars nueve centavos en que las partes habían avalorado dichos bienes, después de deducido el 25 por ciento y por otrosí manifestó que importando la primera hipoteca liquidada al 31 de dicho marzo la suma de 62,044 dollars 61 centavos, según la liquidación producida con los justificantes que la comprobaban, y siendo el importe de la segunda hipoteca, también vencida con sus intereses, al 31 del propio marzo 15,163 dollars 85 centavos, cuyas dos partidas totalizaban un capital adeudado de 77,208 dollars 46 centavos, deducido de ese total el precio de la adjudicación que repre-

sentaba 67,253 dollars cinco centavos, quedaba á favor del Banco un saldo de 9,995 dollars 41 centavos, por lo que suplicaba, que sin perjuicio de decretar desde luego, la adjudicación solicitada, se diera vista á los deudores de la liquidación practicada y se les hiciera saber que los bienes se adjudicaban al Banco por la cantidad de 67,253 dollars cinco centavos y quedaban adeudándole por el concepto de hipotecas vencidas 9,995 dollars 41 centavos, con sus intereses al 9 por ciento anual desde el 31 de marzo citado hasta el día del pago, sin perjuicio de las costas del juicio.

El Tribunal de Humacao por auto de 26 de marzo, adjudicó al Banco por la suma de 67,252 dollars cinco centavos las fincas hipotecadas á su favor con todo lo que en ellas se encerraba, para que se hiciera pago hasta donde alcanzara de la cantidad reclamada, intereses vencidos, premios del seguro, comisión de pago y costas causadas, accediendo también á lo solicitado por el Banco en el otrosí de su escrito de 18 de marzo.

Notificados Cintrón Hermanos del auto de adjudicación, interpusieron contra el mismo recurso de apelación, que les fué denegado y en 26 de mayo de 1903, el Banco fué puesto en posesión de los bienes adjudicados, terminando así el procedimiento de apremio seguido por el Banco contra Cintrón Hermanos.

El abogado don José María Cuadra, en representación de doña Eulalia y doña Margarita Cintrón, socios de la sociedad agrícola Cintrón Hermanos, y á nombre de doña Aurea Cuadra, como madre de los menores don José Luis y don José Cintrón, habidos en su matrimonio con el difunto don José Facundo Cintrón, socio también de Cintrón Hermanos, presentó demanda ante el Tribunal de Distrito de San Juan con fecha 28 de abril de 1903 contra el Banco Territorial y Agrícola, en la que solicitó: 1. Que se declare nula y de ningún valor la adjudicación

hecha al mencionado Banco por la Corte de Distrito de Humacao de la Central "Laura", sita en Yabucoa, con las demás fincas anexas y cuanto en ellas se contiene, é ineficaces todas las actuaciones practicadas para llegar á ese resultado, así como todos los actos efectuados por consecuencia de tal adjudicación, reponiendo las cosas al estado que tenían antes de iniciarse el juicio ejecutivo sumarísimo contra la sociedad Cintrón Hermanos; 2. Que se ordene también al referido Banco á indemnizar á los miembros de la expresada sociedad Cintrón Hermanos, ya disuelta, todos los daños y perjuicios que con ese procedimiento y su administración les ha causado, á justa regulación de peritos nombrados por ambas partes y un tercero que en caso de discordia eligiría el Tribunal; 3. Que se declare asimismo que el propio Banco debe abonar á los dueños de los bienes adjudicados, no sólo los rendimientos producidos, sino todos los que para ellos han debido producir desde que se hizo cargo de su administración; y 4. Que se ordene que, de acuerdo con las anteriores resoluciones y por peritos que también designen las partes y por un tercero que en caso de discordia elija el Tribunal, se proceda á una liquidación de todos los créditos que cobra el Banco á Cintrón Hermanos, hipotecarios y comunes, á fin de fijar su montante verdadero, para cuyo pago con los productos de los mismos bienes, continuará administrándolos con sujeción á lo pactado en la escritura de 23 de mayo de 1900, á menos que otra cosa acuerden ambas partes en vista del resultado de esa liquidación, condenando en costas al repetido Banco, si se opusiere á la demanda.

Como fundamentos de hecho de la anterior demanda alegó la sociedad agrícola demandante la existencia del crédito hipotecario de 90,000 pesos mexicanos que le facilitó el Banco, mitad en efectivo y mitad en cédulas hipotecarias, con las condiciones que se estipularon en la

escritura pública de 29 de abril de 1895, que sirvió de fundamento á la demanda inicial del procedimiento de apremio seguido por el Banco contra Cintrón Hermanos: relacionó también en los diversos compromisos contraídos por la referida sociedad con el Banco en la otra escritura pública de 4 de agosto de 1899, en la de 16 de noviembre del mismo año, en el documento privado de 17 de marzo de 1900, en la liquidación de 17 de mayo del mismo año, en la otra escritura hipotecaria de 19 del propio mayo y en la otra escritura de 23 del repetido mayo, de cuyos documentos todos ya anteriormente se hizo mención con relación de su contenido; agrega además Cintrón Hermanos, que á consecuencia de lo pactado en la escritura de 23 de mayo de 1900, se formó un inventario y avalúo de los edificios y maquinarias de la hacienda "Laura," que ascendió á 52,450 dóllars, y otro que efectuaron sin ponerle precio, un empleado del propio Banco y el mayordomo de la "Laura," de la vía férrea, wagones y demás útiles y enseres de la misma, así como de su ganado vacuno y caballar, pignorados para asegurar el crédito de nueve mil dollars contraído por la escritura de 23 de mayo de 1900, é igualmente de las plantaciones existentes que constituían parte de la prenda dada para garantía del otro crédito de 12,176 dollars 90 centavos, contraído por la misma escritura, existiendo, según ese inventario en la "Laura" 417 cuerdas y media de cañas, de las cuales, 302 eran retoño de primer corte; que ese segundo crédito de 12,176 dollars 90 centavos, para cuyo pago, según la clásula 6a. de la escritura de 23 de mayo de 1900, se entregó al Banco, en primer término, la administración de la "Laura" y demás fincas á ella anexas, quedó íntegramente satisfecho en el mismo año de 1900, y si después de cobrada esa acreencia, continuó el Banco, como ha continuado, administrando tales fincas, ha sido

en virtud de lo estipulado en la cláusula 10a. de dicha escritura de 23 de mayo de 1900, para dedicar los productos de todas clases á reembolsarse, después de cubiertos los gastos de administración, de los intereses, premios del seguro, comisiones y capital pendiente de la primera hipoteca constituída en 29 de abril de 1895; que el Banco, después de haberse apoderado del manejo de todos los bienes de Cintrón Hermanos, en vez de administrarlos como un buen padre de familia para que sus rendimientos fueran mayores, abandonó el cultivo y la elaboración de los productos de la central "Laura" para beneficiar otra en que estaban y están interesados algunos de los directores del mismo Banco, y cuando había arruinado copletamente la "Laura", entabló contra Cintrón Hermanos, ante la Corte de Distrito de Humacao, formal demanda para el cobro de 58,103 dollars 82 centavos, que dijo se le adeudaban por capital y premios del seguro, intereses de esas sumas hasta el 25 de septiembre de 1902, y comisión de pago anticipado, según la escritura de 29 de abril de 1895, así como los nuevos intereses y renovaciones del seguro que se devengaran desde aquella fecha, é importe de todos los gastos y costas que se causaran al acreedor; que la liquidación hecha por el Banco, según la cual, la deuda vencida de Cintrón Hermanos ascendía en 25 de septiembre de 1902 á la referida suma de 58,103 dollars 82 centavos, no había obtenido la conformidad de la sociedad Cintrón Hermanos, y era además inexacta, según revelaban los términos de la misma demanda, y tampoco era líquida ni estaba vencida, pues el Banco, consintió en cobrar su crédito con los productos de la Central "Laura", que ha venido poseyendo y manejando con este objeto desde el año de 1900, siendo por tanto evidente que aquella cantidad es superior á la que realmente debían Cintrón Hermanos en septiembre de 1902; que el Banco silenció en su demanda hechos consignados en la escritura de 23

de mayo de 1900 que modificaron profundamente la obligación hipotecaria de 29 de abril de 1895, extinguiéndola por novación y confusión, si bien reconoció al fijar los fundamentos de derecho de dicha demanda, que por el sólo hecho de presentarla se sujetaba á indemnizar cuantos daños y perjuicios irrogase á los deudores ó á terceros interesados por malicia ó negligencia en la fiel exposición de los hechos; que también guardó silencio el Banco sobre dos circunstancias que debían influir poderosamente para que el Tribunal de Humacao hubiese podido apreciar si debía autorizar el procedimiento ejecutivo sumarísimo y la forma de sustanciarlo, siendo una de esas circunstancias la subhipoteca constituída por el propio Banco en favor de los tenedores de sus cédulas sobre la misma hipoteca que cobraba, y la otra, la demanda que en juicio declarativo tenía establecida ante la Corte de Distrito de San Juan para la cancelación de la referida sub-hipoteca, fundándose en que los tenedores de esas cédulas son los verdaderos dueños de la hipoteca que ha reclamado ejecutivamente; que los tenedores de aquellas cédulas no fueron notificados ni citados para la subasta, y los edictos publicados solamente en un periódico de esta ciudad, de escasa circulación, para la celebración de la primera subasta, carecían de la expresión del valor detallado de los bienes que debían rematarse y de las responsabilidades á que estaban afectos; y que á pesar de haber reclamado los deudores oportunamente para que esas omisiones y deficiencias se subsanaran antes de efectuar la segunda subasta, tuvo ésta lugar el 17 de marzo de 1902, en el pueblo de Guayama, lugar distinto de la cabecera del Distrito, que es Humacao, sin que se accediera á su reclamación y sin que en los edictos, que sólo una vez se publicaron en un periódico de esta capital, se hubiese hecho constar el sitio del remate, ni fueran notificados los deudores, á pesar de haber comparecido en los autos; invocó la so-

ciedad Cintrón Hermanos, como fundamentos de derecho, los artículos 144 de la Ley Hipotecaria, 169, 171, 172 y 175 del Reglamento para su ejecución, 1160, 1171 y 1172 del Código Civil, y 1433, 1436, 1438 y 1455 de la Ley de Enjuiciamiento Civil; y concluyó con la súplica de que se dictara sentencia de conformidad con sus pretensiones.

La parte demandante amplió su demanda, estableciendo además, como hechos fundamentales de la misma, que el Banco Territorial y Agrícola era el primero y único acreedor hipotecario de Cintrón Hermanos, habiéndose fijado de común acuerdo por los contratantes en la escritura hipotecaria de 29 de abril de 1895, el valor de las fincas que se hipotecaron, y que al sacarse á subasta esos bienes, pasados los treinta días del requerimiento, no sólo se dijo en los edictos que se admitirían posturas por los dos tercios del valor en que fueron apreciados, sino que se hicieron dos subastas, rebajando en la segunda la cuarta parte de la tasación convenida, lo cual dió lugar á que no habiendo habido licitadores en la primera ni en la segunda subasta, se adjudicaran los bienes al acreedor por la mitad del valor en que las mismas partes los tasaron, infringiéndose así los artículos 127 y 128 de la Ley Hipotecaria, de los cuales se deduce que no pudo celebrarse legalmente más que una subasta, ni efectuarse el remate, ni decretarse la adjudicación, sino por el valor fijado en la escritura y en los primeros anuncios publicados.

Al contestar el Banco Territorial y Agrícola la demanda ampliada, manifestó estar conforme con los convenios que había celebrado con Cintrón Hermanos en los diversos documentos que invoca la parte actora en su escrito de demanda, y también está conforme con el hecho consignado en la escritura de 23 de mayo de 1900, en la que se declara estar vencida la parte pendiente del capital de la primera hipoteca y se consigna además que

si el Banco lo creía conveniente á sus intereses, podría tomar la administración de la finca por convenio privado ó judicialmente, dedicando sus productos á reembolsarse los gastos de administración y los intereses, premios de seguros y capital pendiente de la primera hipoteca; pero agrega que, según la cláusula 6a. de la referida escritura, la administración de la Central "Laura" se entregó al Banco para el cobro de los 12,176 dollars 90 centavos del saldo de las acreencias no hipotecarias, estipulándose que "en consecuencia, el Banco venderá los frutos y productos de la finca, con abono á la cuenta de ese crédito, y con cargo á ella, y hasta donde lo crea conveniente, hará los gastos necesarios para el sostenimiento de los cultivos y plantaciones y el de su elaboración para convertirlos en productos realizados," pactándose también, en la cláusula 7a., que el Banco pagaría por Cintrón Hermanos á De Ford y Ca., dos obligaciones cuyo importe total de 10,518 pesos provinciales cargaría á la cuenta de administración, abonando en cambio á la misma por todo su valor nominal, con la parte vencida del cupón corriente, las 188 cédulas de la segunda emisión y las cincuenta de la quinta que estaban pignoradas en garantía, y de las cuales desde luego se hacía cargo el Banco; que Cintrón Hermanos se obligaron á pagar al Banco el referido Crédito de 12.176 dollars 90 centavos con sus intereses al 9 por ciento anual á partir del 17 de mayo de 1900, fecha de la liquidación, en un término que no excederá del 15 de julio del mismo año, y en esa fecha, la cuenta de abonos hechos al referido crédito, sin el cargo de los gastos ni de la comisión convenida, sólo había reducido el crédito á 6,364 dollars 69 centavos, mientras que la cuenta de gastos de la administración arrojaba á favor del Banco un saldo de 4,638 dollars tres centavos, que sumado con el anterior da un montante de 11,002 dollars 72 centavos, sin contar la comisión de venta de azúcares no cargada todavía, sin

que en esa fecha se hubiera realizado aún el pago á Dé Ford y Ca. de los 10, 518 pesos provinciales con cargo á la cuenta de la administración del Ingenio Central "Laura", ni se hubiera hecho el abono convenido de las cédulas pignoradas; que en 28 de enero de 1901, es decir, 28 días después de transcurrido el año de 1900, en que aseguran Cintrón Hermanos haber pagado los 12,176 dollars 90 centavos del repetido crédito, se liquidaron ambas cuentas, la del crédito y la de la administración de la Central "Laura", y de las dos resultó un saldo á favor del Banco de 17,810 dollars 67 centavos; que Cintrón Hermanos nunca usaron del derecho de hacer reparos á las cuentas de administración cada treinta días, por lo que aquéllas debían entenderse, desde luego, aprobadas, según lo convenido; pero tales cuentas les fueron remitidas, y en 6 de marzo de 1901 mostraron su conformidad con las mismas; que el Banco siguió administrando la finca, no sólo por el derecho que tenía, sino por súplica de Cintrón Hermanos, para cobrarse de la cuenta de administración, y en 30 de junio de 1901 remitió de nuevo dicha cuenta que empezaba con el saldo anterior conforme de 17,810 dollars 67 centavos y concluía con un saldo á favor del Banco de 11,723 dollars 44 centavos, con cuyo saldo firmaron su conformidad Cintrón Hermanos en 25 de agosto del mismo año: que el Banco produjo nueva cuenta hasta 31 de diciembre de 1901, con un saldo á su favor de 26,353 dollars 60 centavos, mostrando nuevamente su conformidad Cintrón Hermanos con fecha 31 de enero de 1902; que por la cuenta de la administración de la Central "Laura", formada para el cobro del crédito de los 12,176 dollars 90 centavos y de los gastos de la administración, después de abonados todos los productos de la finca en tiempo oportuno, se adeudaba al Banco en 30 de junio de 1902 un saldo de 14,606 dollars 69 centavos, sin haber abonado un solo

centavo al crédito de la primera hipoteca; que disuelta ó no la sociedad Cintrón Hermanos, esa sociedad y cada uno de sus miembros están obligados en todo tiempo á responder del cumplimiento del contrato y de sus consecuencias; que á raíz del ciclón de agosto de 1899, atrasados Cintrón Hermanos en el pago de su deuda y con los edificios y fábricas destruídos por el huracán, consiguieron del Banco nuevos recursos y que él mismo tomase la administración de la finca, á lo que accedió para el cobro de la nueva cuenta, pero sin obligarse más que mientras lo creyese conveniente, y hasta donde le pareciese bien; que los gastos hechos en la reedificación siempre resultaron defectuosos y costosísima la elaboración, por lo que trató de que se moliera el cosecho de 1901 á 1902 en la Central "Mercedita", lo que consultó con Cintrón Hermanos, quienes contestaron que aunque el Banco podía hacer lo que juzgara más conveniente, ellos conceptuaban aquella idea ruinosa para la finca, pidiendo que se hicieran nuevas instalaciones y fábricas, en vista de lo cual, limitando en lo posible los gastos de nuevas reparaciones, comenzó la molienda en la misma Central "Laura", hasta que transcurrido el período de la elaboración, sin que pudiera terminar por mal funcionamiento de los aparatos y por las inclemencias de un tiempo contrario, hubo de moler las últimas cañas para que no se perdieran en la inmediata Central "Mercedita"; que no pudiendo ya con la carga de la administración, inició el procedimiento de apremio para la ejecución de la hipoteca, y suspendió á Cintrón Hermanos la subvención mensual que les pasaba para su sostenimiento; que en la demanda para el cobro del crédito hipotecario se sufrió un error que luego fué rectificado al liquidar el crédito garantido por la segunda hipoteca, cuyo error no era de importancia, porque ese segundo crédito hipotecario no era la base de la

ejecución; que la liquidación del montante de la deuda contraída por la escritura de 29 de abril de 1895, no contiene error alguno, siendo el resultado verdadero de las operaciones aritméticas practicadas; que no han existido la novación y confusión alegadas por Cintrón Hermanos; que el Banco no mencionó en su demanda ejecutiva los hechos, cuya omisión nota Cintrón Hermanos, porque nada tenían que ver con el crédito ejecutado; que no silenció la sub-hipoteca constituída á favor de los tenedores de cédulas sobre el crédito hipotecario que se trataba de ejecutar, pues en la certificación del Registro de la Propiedad de Humacao que se acompañó á la demanda ejecutiva constaba la escritura de esa sub-hipoteca, añadiéndose que no había terceras personas á quienes dar intervención en el procedimiento, y en cuanto á la demanda de nulidad de dicha sub-hipoteca, se hizo omisión de ella en el ejecutivo, porque nada tenía que ver con éste; que los edictos publicados para la subasta contenían todas las circunstancias que la ley exige; que la segunda subasta se celebró en Guayama por estar constituído allí el Tribunal de Distrito de Humacao; que Cintrón Hermanos se personaron en el procedimiento sumarísimo tratando de entorpecer su marcha, y aquel Tribunal declaró que no eran parte en dicho procedimiento, en el cual se han cumplido todas las formalidades de la Ley sin incurrirse en vicio alguno de nulidad; y que además de la falta de acción por falta de los demandantes, procedía oponer la excepción de falta de personalidad, tanto por no estar representado en autos el socio don Zóilo Cintrón, cuanto por no haber acreditado doña Aurea Cuadra la representación que ostenta. Invocó el Banco, como fundamentos de derecho, los artículos 128 de la Ley Hipotecaria, 171 y 172 del Reglamento para su ejecución, 1517, 1527, y 1455 de la Ley de Enjuiciamiento Civil, y 1160, 1171 y 1172 del Código Civil, y concluyó

con la súplica de que se declarara sin lugar la demanda en todas sus partes, con las costas á los demandantes.

En cuanto á las pruebas practicadas en el juicio, es de notar que se ha justificado el matrimonio de don José Facundo Cintrón con doña Aurea Cuadra, habiendo nacido de ese matrimonio los niños José y José Luis hoy representados por su madre, y que de los documentos otorgados por el Banco Territorial y Agrícola y la sociedad Cintrón Hermanos de que ambas partes hacen mérito en sus alegaciones, solo aparecen en el récord copias de la escritura de 29 de abril de 1895, que fué la que sirvió de título al procedimiento de apremio, de 19 de mayo de 1900 por la que Cintrón Hermanos constituyeron segundo crédito hipotecario á favor del Banco, y de 23 de mayo de 1900 en la que además de consignarse los convenios en ella estipulados, se hizo relación también de la escritura de 29 de abril de 1895, de la de 4 de agosto de 1899, de la de 16 de noviembre del mismo año, del documento privado de 17 de marzo de 1900, de la liquidación de créditos de la misma fecha, y de la escritura hipotecaria de 19 de mayo de 1900.

Figuran también en el récord por medio de certificación ó testimonio los antecedentes del procedimiento de apremio comprobatorios de los hechos que ya hemos expuesto relativos á dicho procedimiento; pero no aparece copia de la certificación de cargas que asegura el Banco haber presentado con la demanda ejecutiva, y que no dudamos fuera presentada.

Vinieron también al juicio las cuentas de administración de la Central "Laura", desde que el Banco se hizo cargo de dicha administración hasta el 30 de junio de 1902; y de esas cuentas, con las que manifestaron conformidad Cintrón Hermanos, representados por don Aurelio Dapena ó don Mariano Martorell, resulta que en la última fecha expresada adeudaba la aludida sociedad

al Banco un saldo líquido de 14,606 dollars 69 centavos; siendo de notar que las firmas de Dapena, ya fallecido, fueron cotejadas con otras indubitadas del mismo por el perito calígrafo don José Becerra, quien aseguró su autenticidad y que el abogado de los demandantes expresó en la segunda sesión del juicio oral que aceptaba como auténticas las firmas de Martorell aprobando las cuentas de administración de la Central "Laura" en 31 de enero y 30 de junio de 1902, sin que por ello le reconociera facultad bastante para otorgar semejante aprobación.

El Abogado del Banco don Juan Guzmán Benitez declaró en el acto del juicio oral que en 23 de mayo de 1900, con arreglo á las escrituras de esa fecha, se hizo cargo el Banco de la Central "Laura" para cobrar acreencias no hipotecarias contraídas por Cintrón Hermanos, sin que abonara á esa sociedad el valor de las plantaciones de cañas de la referida Central, porque éstas eran garantía de un crédito y no procedía abonarlas; pero sí abonaron á Cintrón Hermanos en la cuenta de la administración de la Central "Laura" el producto de esas plantaciones, así como también le cargaron los gastos producidos para el cultivo y elaboración del azúcar; y en cuanto á los rails, wagones, y demás muebles, tampoco se los abonaron por su garantía de otro crédito, para cuyo pago se realizarán, á falta de pago por Cintrón Hermanos, con arreglo á la escritura ya expresada de 23 de mayo de 1900.

Los peritos don José Ramírez y González, don Antonio Lopez y don Andrés Antelo, nombrados por Cintrón Hermanos y aceptados por el Banco, manifestaron en informe emitido con fecha 12 de abril de 1904, ratificado en el acto del juicio oral, que examinadas 157 cuerdas de caña que quedaban por moler, se encontraban en pésimo estado de cultivo y eran de las peores variedades que se conocen en la Isla; que esas 157 cuerdas probablemente no traspasarían el promedio rendimiento de 292

quintales por cuerda de las molidas; que para la zafra de 1905 no se había hecho siembra alguna de gran cultura, y solamente había un pequeño número de cuerdas de primavera y algún terreno en preparación para continuar la siembra correspondiente á la zafra de dicho año; que las fábricas, maquinarias y aparatos se encuentran en buen estado; que había 82 yuntas de bueyes en mal estado, debidos á estar mal cuidados y al exceso de trabajo extraño á la finca; que los seis kilómetros de vía férrea se encontraban en regular estado, y de los 99 wagones existentes había 87 en uso; que sólo había 8 carros de cajón con ejes de madera, en mal estado, arados, yugos, cadenas, etc., y lo necesario para tan deficiente material agrícola; que los perjuicios y menoscabos podían deducirse del estado que presentaba la Central y que demostraba una administración desastrosa, pues nada se advertía que indicara celo, cuidado, previsión y esmero en la buena conservación y fomento de aquélla; que de unas mil doscientas cuerdas de que se compone la finca, sólo había cultivadas 444, y como sesenta en preparación y nueva siembra, debiendo quedar una 700 de magníficos pastos, donde podrían mantenerse perfectamente cebados los 164 bueyes de la finca y como 400 ó 500 cabezas más de ganado, que al cuido ó utilidades podrían rendir un beneficio de 3,600 dollars anuales, no obstante lo cual los bueyes de la finca se encontraban en estado lamentable y no había pasto suficiente para su alimento; que teniendo en cuenta las favorables condiciones de la finca y la capacidad de su maquinaria y aparatos, podían obtenerse durante el período de zafra de cada año 10,000 sacos de azúcar y un beneficio líquido de 30,000 dollars, haciendo caso omiso del producto que puede rendir el alambique, cuyo ron ha sido siempre de superior calidad, con el fin de suplir cualquiera diferencia que pudiera notarse en cálculo anterior; que en el cosecho de 1902 se obtuvo un

beneficio líquido de 7,910 dollars 92 centavos, y en el cosecho de 1903 hubo una pérdida de 6,227 dollars; que la cuantía de los perjuicios sufridos por la "Laura" durante la administración del Banco es igual á la suma de las ganancias que de menos se obtuvieron en cada año agrícola transcurrido bajo dicha administración; y que la causa de los quebrantos sufridos no fué otra que la mala administración del Banco.

La Corte de Distrito de San Juan, por el mérito de las alegaciones de las partes y del resultado de las pruebas practicadas, dictó sentencia por mayoría de votos en 23 de junio del año próximo pasado, cuyas consideraciones de derecho y parte dispositiva dicen así:

*Considerando*: que habiéndose celebrado segunda subasta en la ciudad de Guayama, lugar distinto de la residencia habitual del Tribunal, sin expresarse tampoco en los edictos el lugar en que la subasta había de tener lugar, como previene el inciso 2o. del Reglamento, artículo 172 de la Ley Hipotecaria, pero debiendo inferirse de las circunstancias de ser Humacao la capitalidad del Distrito, de estar los edictos fechados en dicha ciudad, y de pertenecer el término municipal de Yabucoa en que las fincas hipotecadas están radicadas al sub-distrito de Humacao, que la subasta habría de verificarse en Humacao y no en Guayama, arguye un vicio de nulidad en dicha segunda subasta, que vicia también de nulidad la adjudicación de los inmuebles hipotecados, hecha al Banco hipotecante por falta de licitadores, que acaso acudieran á Humacao.

*Considerando*: que no puede argüirse en contra de la expresada nulidad, que según la orden general número 15, serie de 1900, en su sección 4, el Tribunal de Humacao, ora actúe en Caguas, ora en Guayama, conserva su jurisdicción, pues no se discute la jurisdicción de dicho Tribunal para conocer del procedimiento hipotecario de cuya nulidad se trata, celebrando la subasta correspondiente, como parte integrante y esencial de dicho procedimiento, sino del defecto fundamental de no haberse expresado en los edictos el sitio de la celebración de la segunda subasta, ni haber tampoco suplido esta omisión, efectuándose dicha subasta en el sitio que naturalmente había de suponerse por los licitadores que ésta tendría efecto, teniendo en cuenta las razones consignadas.

*Considerando*: á mayor abundamiento, que dicha segunda subasta

es nula también, porque el artículo 128 de la Ley Hipotecaria, autoriza una sola y única subasta; sin que valga argüir que el Reglamento de la Ley Hipotecaria regula la segunda y sucesivas subastas, y que la Ley Hipotecaria, en su artículo 172, párrafo 8o., establece que el Reglamento determinará los demás pormenores de procedimiento hipotecario sumario, pues regulares pormenores de procedimientos, no pueden entenderse como autorización para estatuir trámites incompatibles con el texto expreso y terminante de la Ley.

*Considerando*: que no son de apreciarse los demás motivos de nulidad alegados en la demanda, sin que se estime necesaria la discusión especial de cada uno de ellos.

*Considerando*: que habiendo tomado el Banco la hacienda "Laura" hipotecada en administración, para cubrir con sus productos una acreencia no hipotecaria, según pacto expreso consignado en la cláusula 6a. de la escritura de 23 de Mayo de 1900, carece de base la pretensión de la actora de que existió novación del contrato de préstamo hipotecario, convirtiéndose en anticresis con todas las consecuencias jurídicas inherentes á esta forma de extinguir las obligaciones contractuales.

*Considerando*: que no hay términos hábiles para condenar al Banco á las devoluciones de frutos y rentas percibidos, ni tampoco á que los abone á los actores, porque tales productos se han aplicado al pago de acreencias no hipotecarias, según lo pactado, aprobándose las cuentas correspondientes por los representantes de la Sucesión Cintrón, Sres. Dapena y Martorrell, que según las cláusulas 11, 12 y 13 de la escritura de 23 de Mayo de 1900, podían actuar con plenos poderes en representación de aquélla; no pudiendo surtir tampoco el efecto de condenar á la devolución de frutos, la nulidad de la adjudicación, porque encontrándose el Banco al efectuarse aquélla en posesión de la finca, y percibiendo sus productos, de acuerdo con lo pactado, para aplicarlos al pago de créditos no hipotecarios, no es posible ordenar tal devolución, desconocer la eficacia de tal pacto, que no ha sido desde este punto de vista objeto de discusión en este litigio.

*Considerando*: que según la Jurisprudencia del Tribunal Supremo de España y las disposiciones del Código Civil que regulan la materia de indemnización de daños y perjuicios, éstos no son exigibles cuando no se causan por dolo, culpa ó negligencia de la parte demandada, sin que proceda por consecuencia de la nulidad de actuaciones que no se originó por actos del demandado.

*Considerando*: que es improcedente por lo antes expuesto, en los Considerandos precedentes, la liquidación general de créditos solicitada por la actora, y el pedimento de que se obligue al Banco á continuar la administración de la fincas hipotecadas, á no ser que otra cosa se conviniere.

*Considerando*: que no desestimándose en totalidad las pretensiones de ninguna de las partes, las costas deben declararse sin especial condenación.

*Vistos* los artículos citados, y los de aplicación general de la Ley de Enjuiciamiento Civil, Orden General 118, serie de 1899.

*Fallamos*: que debemos declarar y declaramos sin lugar los distintos extremos de esta demanda, absolviendo al Banco de la misma, excepto en lo relativo á la petición de nulidad de la segunda subasta, diligencia posterior y auto de adjudicación, cuyas actuaciones declaramos nulas, sin especial condenación de costas.

Así por esta nuestra sentencia lo pronunciamos, mandamos y firmamos.—Juan Morera Martínez.—Frank H. Richmond.—José Tous Soto.''

## El voto particular está concebido en los términos siguientes:

''Voto particular del Sr. Juez Presidente Don Juan Morera Martínez.—El Juez Presidente, al votarse la sentencia, disintió de la declaratoria de nulidad de la segunda subasta, diligencias posteriores y auto de adjudicación, y no puede estar conforme respecto á ese punto con la declaratoria que se hace, ni con los dos primeros Considerandos de la sentencia, ni con el último, aceptando los demás, y cree que la sentencia debe contener lo siguiente:

*Considerando*: que el procedimiento sumarísimo seguido por el Banco Territorial y Agrícola contra Cintrón Hermanos se funda en las cantidades no satisfechas de la escritura hipotecaria de 29 de abril de 1895, líquidas y vencidas, dada la cláusula tercera que da por vencida toda la deuda cuando lo están dos de sus plazos semestrales, como ha ocurrido, el derecho que por ella tiene á cobrar el interés convenido del nueve por ciento anual, los premios del seguro por el Banco pagados, y la comisión pactada, consignando en el escrito de iniciación del procedimiento, sujetarse á indemnizar cuantos daños y perjuicios irrogare á los deudores ó á terceros, como la ley previene, no es posible anular el procedimiento y reponerle al estado que tenían al iniciarse el juicio.

*Considerando*: que no teniendo los otros contratos hipotecarios y

no hipotecarios, ni sus liquidaciones, nada absolutamente que ver con la hipoteca reclamada, por no afectarla lo más mínimo, no es posible tener esos créditos y sus escrituras en cuenta en el procedimiento sumarísimo, ni menos la entrega por Cintrón Hermanos al Banco, de la administración y dirección de la hacienda "Laura" y fincas anexas, con arreglo á contratos posteriores, por explicarlo bien claro la cláusula 6a. de la escritura de 23 de mayo de 1900.

*Considerando*: que seguido en forma el procedimiento sumarísimo, practicadas la primera y segunda subasta, anunciándose por edictos en el periódico, en el pueblo de Yabucoa, en el sitio de costumbre de Humacao, con todos los detalles indispensables, no apareciendo el compareno de postores en la segunda subasta, no es posible anularla por haberla efectuado la Corte de Distrito de Humacao en Guayama, en el período en que en dicho pueblo debía funcionar, por lo que la Orden General no. 15, de 25 de enero de 1900, previene, que el Tribunal de Humacao, ya actúe en este punto, ya en Caguas ó Guayama, conserva siempre su jurisdicción con la sola excepción que mientras actúe en cada uno de los puntos sólo podrá celebrar juicios orales que correspondan á los términos municipales á dichos puntos asignados que la orden menciona.

*Considerando*: que expresándose en los edictos que el remate se celebraría ante el Tribunal de Distrito de Humacao, fijando día y hora, no habiendo reclamado ni acreditado que se reclamara por ningún postor en Yabucoa, Humacao, ni en Guayama, el día de la subasta ni que se presentaran á hacer proposiciones, no es posible anular la segunda subasta, no deduciéndose tampoco la nulidad del artículo 128 de la Ley Hipotecaria, porque, si bien el apartado 3o. dice: "No habiendo postor, podrá el ejecutante pedir que se le adjudiquen los bienes, respondiendo de todas las cargas anteriores si las hubiere; no significando ésto pretenda dicha Ley una sola subasta por decir el último apartado del artículo". "En el Reglamento se determinarán los demás pormenores á que ha de ajustarse este sumario procedimiento," y en el artículo 172 del Reglamento, admite, no sólo la segunda subasta, si que otras.

*Considerando*: que el derecho á disponer de la cosa hipotecada á fin de obtener un pago que el deudor demora ó resiste, es perfectamente inherente á la naturaleza de la hipoteca, y por esto no es posible negar el derecho que puede ejercer mediante los trámites legales, requisitos exigidos por la Ley como garantía cierta de que no será expoliado el deudor con inmoral enriquecimiento del acreedor, lo que demuestra la necesidad de las sucesivas subastas, y se lle-

ne el objeto y fin de la Ley, desapareciendo la desconfianza, proporcional capital y dar al prestamista seguridades de pronto y fácil cobro.

Aceptando los demás Considerandos, y por el último el siguiente:

*Considerando*: que desestimadas todas las pretensiones de la demanda, deben ser condenadas las demandantes en las costas.

Creo que debe declararse también sin lugar la demanda en todo lo que se pide en el primer extremo, y en especial en lo relativo á la petición de nulidad de la segunda subasta, diligencias posteriores y auto de adjudicación cuyas actuaciones como todas las del procedimiento sumario hipotecario declaramos válidas con las costas á los demandantes.—Juan Morera Martínez.''

Contra la sentencia pronunciada interpusieron ambas partes recurso de apelación, el Banco por haberse declarado nulas las actuaciones del procedimiento sumario á partir de la segunda subasta, y los demandantes por haberse declarado sin lugar los demás extremos de la demanda; cuyos recursos, después de oidas por escrito y oralmente las alegaciones de las partes, penden hoy de decisión ante esta Corte Suprema.

Las cuestiones legales traídas á discusión con motivo del primer pronunciamiento que se solicita en la súplica del escrito de demanda, son las siguientes:

1.—Novación del título ejecutivo, fundamento de la demanda inicial del procedimiento de apremio seguido por el Banco Territorial Agrícola contra la sociedad Cintrón Hermanos, para el cobro parcial del crédito hipotecario contraído por escritura pública de 29 de abril de 1895.

2.—Confusión en una misma persona de los caracteres de acreedor y deudor, mediante la escritura pública de 23 de Mayo de 1900, extinguiéndose así la obligación hipotecaria reclamada.

3.—Inexigibilidad de dicha obligación hipotecaria, por no ser ésta cierta, ni líquida, ni vencida, dado el contenido de la escritura de 23 de mayo de 1900, en virtud de

la cual se hizo cargo el Banco de la administración de la Central "Laura" para el cobro del crédito hipotecario.

4.—Falta de notificación de la subasta de la Central "Laura" á los tenedores de cédulas hipotecarias, con infracción del segundo párrafo del artículo 172 del Reglamento de la Ley Hipotecaria, por ser esos tenedores acreedores de la sociedad bancaria, que tienen inscritos sus derechos sobre el crédito hipotecario reclamado y por ende, sobre la finca rematada.

5.—Comisión de la publicación de edictos en los sitios públicos de costumbre del lugar en que se seguía el procedimiento, y del en que radican los bienes hipotecados, y de la inserción de dichos edictos en periódicos de circulación de esta Isla, por tres veces á lo menos, según es práctica uniforme, sin que se asignara el valor ó precio de los bienes subastados.

6.—Celebración de la segunda subasta en extraña localidad, ó sea en la ciudad de Guayama, para donde no se había dado, ni podía darse, cita á los postores en el único edicto publicado por una sola vez en el "Heraldo Español", y no fijado en los parajes públicos de costumbre.

7.—Celebración de esta segunda subasta con la rebaja de un veinte y cinco por ciento del justiprecio de los bienes hipotecados, cuando la Ley Hipotecaria, en su artículo 127 solo autoriza una subasta.

8.—Falta de consignación por el Banco de los 9149 dollars 25 centavos que restaron, después de cubierto el crédito reclamado con la adjudicación hecha al Banco de los bienes subastados, habiéndose destinado aquella suma al pago de otro crédito posterior que no había sido objeto de reclamación.

9.—Sustracción de bienes hecha á los deudores á pretexto y con motivo del remate, cuales bienes fueron los que no estaban comprendidos en la hipoteca, ni fueron incluídos en la subasta y servían de garantía á ope-

raciones muy diferentes del crédito hipotecario reclamado.

Examinemos esas cuestiones.

La novación del título ejecutivo del Banco ejecutante no existe, pues dicho Banco tomó la administración de la Central "Laura," no para el cobro del crédito hipotecario que ha sido objeto del procedimiento de apremio, sino para cobrar otra acreencia no hipotecaria de 12,176 dollars 90 centavos, que Cintrón Hermanos contrajeron con el Banco, según así aparece de las cláusulas 2a., 4a. y 6a. de la escritura pública de 23 de mayo de 1900, si bien el propio Banco podía también pedir y tomar esa administración para el cobro de la primera hipoteca á que se refiere la escritura pública de 29 de abril de 1895, según la cláusula 10a. de aquella escritura. Y no puede afirmarse que el crédito para cuyo pago tomó el Banco la administración de la Central "Laura," estuviera ya satisfecho en la fecha en que se inició el procedimiento de apremio, y que en esa fecha por tanto el Banco administrara la "Laura" para dedicar sus productos al pago del crédito hipotecario, pues las cuentas de administración existentes entre el Banco y Cintrón Hermanos, que han venido á los autos, están revelando lo contrario.

No comprendemos la confusión en el Banco de los conceptos de acreedor y de deudor, por haberse encargado aquel de la administración de la Central "Laura" para cobrar con sus productos el crédito de 12,176 dollars 90 centavos; pero aun en el supuesto de que existiera tal pretendida confusión, no podría ejercer influencia alguna en la extinción de la obligación hipotecaria reclamada por el Banco, pues una obligación es completamente independiente de la otra.

El crédito hipotecario reclamado por el Banco en el procedimiento de apremio había sido constituido por escritura pública de 29 de abril de 1895, debidamente ins-

crita en el Registro de la propiedad de Humacao, y por
tanto era cierto; también era líquido, pues representaba
la suma de 58.103 dollars dos centavos, basada en cálculos
aritméticos, bajo datos que arrojaba aquella misma es-
critura; y finalmente, estaba vencido, según lo demos-
traba dicha escritura, y lo confesaron Cintrón Hermanos
en la de 23 de mayo de 1900; sin que pueda invocarse en
contrario la administración de la Central "Laura" por
el Banco, pues ya se deja dicho que esa administración
no tenía relación con el cobro del crédito hipotecario re-
clamado, y sí con otro crédito de naturaleza distinta.
Era, pues, cierta, líquida y vencida le deuda hipotecaria
reclamada, y por tanto exigible.

No cónsta en los autos la certificación de cargas que
pesaban sobre la hacienda "Laura", que se acompañó á la
demanda inicial del procedimiento de apremio; pero aún
admitiendo que en esa certificación figuraran los tenedo-
res de cédulas hipotecarias del Banco, siendo como son
éstas documentos al portador, y desconocidos por tanto
los nombres de sus dueños, como también sus domicilios,
no puede afectar á tales tenedores el apartado último del
artículo 171 del Reglamento general para la ejecución
de la Ley Hipotecaria, ni el apartado segundo del artículo
siguiente. La misma representación de Cintrón Herma-
nos lo reconoce así en su alegato, al expresar que por más
que los tenedores de cédulas hipotecarias del Banco eje-
cutante, en el sentido extricto *no son propiamente acree-
dores posteriores mandados citar por el apartado* 2do.
*del artículo* 172 *del Reglamento de la Ley Hipotecaria,*
son al menos tan interesados como ellos en el remate..

· Los edictos anunciando la primera y la segunda su-
basta se fijaron en los sitios públicos de costumbre de la
ciudad de Humacao, lugar donde se seguía el procedi-
miento, y del pueblo de Yabucoa donde radicaban los
bienes subastados, y se insertaron en el periódico "El

Heraldo Español" que se publica en esta Capital, describiéndose dichos bienes, tales como aparecen en el título ejecutivo, consignándose el valor dado á cada finca y expresándose, además de otras formalidades, que el remate se celebraría ante el Tribunal de Distrito de Humacao. La 1a. subasta se celebró en la Ciudad de Humacao, y la segunda en la de Guayama.

La 1a. subasta celebrada en la Ciudad de Humacao fué válida, pues además de llenar los edictos todas las formalidades prevenidas por la ley, tuvo aquella lugar en la ciudad de Humacao, residencia habitual del tribunal del mismo nombre, y sitio donde debía presumirse había de tener lugar el acto.

No sucede lo propio con la segunda subasta, pues si bien los edictos llenaban las formalidades legales, el acto tuvo lugar en la Ciudad de Guayama, lugar distinto de la residencia habitual del tribunal, ó sea de la ciudad de Humacao, que era donde había de realizarse la subasta, á juzgar por los términos en que estaban redactados los edictos. Y prueba de ello es que los edictos para la primera subasta anunciaban que esta se celebraría ánte el Tribunal de Distrito de Humacao, y ese mismo Tribunal entendió que el sitio para la subasta era la ciudad de Humacao, y allí fué que la celebró.

Cierto es que la Orden General Número 15, de 25 de enero de 1900, ordenó en sus Secciones 2a. y 3a. que el tribunal de Humacao se constituiría en Caguas durante un término que no pasara de quince días, cada tres meses, para ver y fallar los asuntos criminales y civiles que correspondan á las jurisdicciones de Cáguas, Aguas-buenas, Hato-grande, (San Lorenzo), Gurabo y Cidra, y que en la misma forma y términos se constituiría dicho Tribunal en Guayama, para ver y fallar los asuntos civiles y criminales que correspondan especialmente á las jurisdicciones de Guayama, Cayey, Salinas, Arroyo y

Patillas; debiendo el Tribunal de Humacao, según la sección 4a., ya actúe en Humacao, Caguas ó Guayama, conservar siempre su jurisdicción, sin más limitación que la de poder celebrar únicamente en Caguas, Guayama y Humacao los juicios orales así civiles como criminales, de los términos municipales respectivos, que se expresan en dicha Orden General.

Como se vé, la Ciudad de Humacao era la residencia habitual del tribunal; pues sólo en períodos determinados, cada tres meses, debía constituirse en Caguas y en Guayama; pero la Orden General de referencia no marca las fechas precisas y determinadas en que el tribunal debía estar constituído en Caguas y en Guayama y no consta en los autos, ni las partes han expresado el modo y forma en que el público venía á tener conocimiento de la constitución del tribunal en los pueblos indicados.

Dúdase por lo expuesto, si el público sabía que el tribunal de Humacao estaba constituído en esa ciudad, en la de Caguas ó en la de Guayama, el día de la celebración de la 2a. subasta; y de presumirse es que siendo Humacao la cabecera del Distrito judicial del mismo nombre, estando los edictos fechados en aquella Ciudad, y radicando las fincas hipotecadas en el término municipal de Yabucoa, el público creyera que la subasta habría de celebrarse en Humacao.

Para que ese acto se celebrara en Guayama, debió anunciarse así previamente en los edictos, según previene el apartado 2o. del artículo 172 del Reglamento de la Ley Hipotecaria. Y no cabe arguir que los tribunales para señalar el sitio de una subasta suelen emplear la fórmula ordinaria de que ésta se verificará ante el tribunal que autoriza los edictos, pues si bien dicha práctica es admisible cuando un tribunal ejercita solamente la plenitud de su jurisdicción en la cabecera del Distritó, no sucedió lo propio cuando el ejercicio de su jurisdicción

puede tener lugar en otros puntos, como sucedía á la Corte de Humacao respecto de las ciudades de Caguas y Guayama.

Además, si la subasta había de celebrarse en Guayama, también allí debieron publicarse los edictos por ser el lugar en que entonces se seguía el procedimiento; y por esa razón, y la anteriormente expuesta de haberse celebrado la segunda subasta en sitio no señalado en los edictos, entendemos fué nula la segunda subasta celebrada en Guayama; pero no estamos conforme con que dicha subasta sea nula por infracción del artículo 127 de la Ley Hipotecaria, que dice así:

"En la escritura de hipoteca se hará constar el precio en que tasan la finca los contratantes, para que sirva de tipo á la única subasta que se debe celebrar, en el caso de que, vencido el plazo del préstano, no conste en el Registro de la Propiedad el pago de dicho préstamo."

Ese precepto, por la generalidad en que está concebido, estatuiría la única subasta tanto para el cobro de las primeras hipotecas, como para el de las segundas y posteriores; y, por tanto, sería lógico deducir que en cualquiera procedimiento de apremio para el cobro de una hipoteca sólo puede celebrarse una subasta.

Tal doctrina está en contradicción abierta con el artículo 128 de la misma Ley Hipotecaria que en el 2o. párrafo del 4o. apartado, dice en términos generales: "Podrán celebrarse, á costa de los ejecutantes que lo pidan, las subastas posteriores que convengan á sus intereses, siempre que acrediten por certificación del Registro, que no han sido aún pagados." También está en contradicción con el Reglamento para la ejecución de la Ley Hipotecaria, que determina el procedimiento que ha de seguirse para el cobro de un crédito hipotecario, sin distinguir entre las primeras hipotecas y las posteriores, cuyo procedimien-

to estatuye la segunda subasta con la rebaja del 25 por ciento del precio que sirvió de tipo para la primera.

La Ley de Enjuiciamiento Civil antigua, aplicable como supletoria al procedimiento sumarísimo de apremio, según el último apartado del art. 176 del Reglamento para la ejecución de la Ley Hipotecaria, también admitía la segunda subasta; y en la exposición de motivos que precede al proyecto de ley de 26 de mayo de 1893 para la reforma de la Ley Hipotecaria, se encuentran los siguientes conceptos: "Pero donde la voz de la experiencia se ha dejado oir con mayor fuerza contra la ley, demandando remedio pronto, es en lo referente al procedimiento para hacer efectivos los créditos hipotecarios. Su complicación abrumadora, la inseguridad de éxito y su coste incalculable, retraen al capital ó sugieren condiciones usurarias; la venta á retro viene sustituyendo al préstamo, para suprimir todo procedimiento con daño del terrateniente; se estipulan intereses que triplican el capital prestado, y tal vez, empleando otras fórmulas, se sujeta con responsabilidades penales al deudor, convirtiendo la santidad de las leyes escritas para castigar delitos, en vil instrumento de la codicia contra el infortunio. Emplea estas artes la desconfianza, porque el procedimiento legal no satisface las exigencias razonables de la contratación, y á cortar la raiz de estos males, proporcionar á la tierra el capital que necesita, y dar al prestamista seguridades de pronto y fácil cobro se consagra la reforma de mayor trascendencia que propone el Gobierno, suprimiendo trámites, que sin garantia positiva de los derechos, ahoga los más sagrados. La previa tasación, la fijeza de la competencia judicial para las diligencias precisas, la supresión de todo pleito, un sólo requerimiento y la subasta inmediata, son las bases de la nueva Legislación; suprímense juicios, excuciones, exhortos, mandamientos de embargo de lo que está ya hipotecado, incidentes, subastas simultáneas y tantas

otras barreras atravesadas en la senda del crédito territorial con noble ánimo, en las que sólo tropieza realmente la buena fe.''

Si hubiera de admitirse, como pretende la representación de Cintrón Hermanos, una sóla subasta para el cobro de las primeras hipotecas, lejos de conseguir ventajas los acreedores primeros hipotecarios con la reforma del procedimiento, hubieran salido perjudicados, cuando precisamente la Ley Hipotecaria y su Reglamento trataron de salvar ante todo los derechos del acreedor ó acreedores preferentes.

No vemos razón alguna para que dado el texto del artículo 127 de la Ley Hipotecaria, se sostenga por el Letrado de la sociedad Cintrón Hermanos que solamente puede verificarse una subasta para el cobro de una primera hipoteca, mientras que para el cobro de la segunda y posteriores puede celebrarse segunda subasta.

El artículo 127 de la Ley Hipotecaria es general, como también es general el segundo párrafo del cuarto apartado del artículo siguiente; y si en vista de dicho apartado es admisible la segunda subasta para los segundos ó posteriores acreedores hipotecarios, por igual razón debe ser admisible para los primeros; y decimos por igual razón, porque si los primeros acreedores son preferentes respecto de los segundos, éstos son preferentes respecto de los terceros, y así sucesivamente. Las razones que invoca la representación de Cintrón Hermanos para que no se admita más de una subasta á los primeros acreedores hipotecarios para no perjudicar á los siguientes, son igualmente aplicables á los segundos acreedores hipotecarios respecto de los posteriores, y así sucesivamente.

Repetimos que la segunda subasta fué nula, por haberse celebrado en Guayama, sin haberse anunciado previamente por edictos; sostenemos que el artículo 127 de

la Ley Hipotecaria, en cuanto se refiere á una sola subasta, ha sido derogado por disposiciones posteriores de la misma Ley Hipotecaria y de su reglamento, que están en contradicción abierta con la única subasta, y que deben prevalecer, por ser la última expresión de la voluntad del legislador y por estar conformes con los fines que se propuso.

Siendo nula la segunda subasta, nulo fué también el auto de adjudicación hecho al Banco de los bienes subastados y ocioso sería entrar á considerar los demás motivos alegados por Cintrón Hermanos en apoyo de la nulidad de dicho auto.

En cuanto al segundo y tercer pronunciamiento que se solicitan en la súplica de la demanda, ó sea que se condene al Banco Territorial y Agrícola á indemnizar á los miembros de la sociedad disuelta Cintrón Hermanos, todos los daños y perjuicios que con su administración y el procedimiento de apremio les ha causado, como también á abonarles, no sólo los rendimientos producidos por los bienes adjudicados, sino los que han debido producir desde que aquél se hizo cargo de su administración, conviene hacer constar, que esa indemnización de daños y perjuicios y ese abono de frutos producidos y debidos producir, pueden referirse á dos períodos distintos, de los cuales, uno comprende el tiempo que medió desde el 23 de mayo de 1900, en que el Banco se hizo cargo de la adiministración de la Central "Laura" hasta el 26 de mayo de 1903, en que fué puesto en posesión de los bienes subastados, á virtud del auto de adjudicación de 26 de marzo del último año expresado, abrazando el otro período, el tiempo á contar desde la fecha de posesión en adelante.

Durante el primer período de tiempo indicado, administró el Banco la Central "Laura" para el pago del crédito de 12,176 dollars 90 centavos convenido en la

escritura de 23 de mayo de 1900, no para el cobro de acreencia alguna hipotecaria, y en la cláusula 6a. de esa misma escritura se estipuló que el Banco vendería los frutos y productos de la finca con abono á la cuenta de aquel crédito y con cargo á ella, y hasta donde lo creyera conveniente haría los gastos que estimase necesarios para el sostenimiento de los cultivos y plantaciones y los de su elaboración para convertirlos en productos realizables, pactándose además en la cláusula 11a. que Cintrón Hermanos prestarían su conformidad ó harían reparos justificados á las cuentas de gastos de la administración de la finca en las oficinas del banco cada treinta días, á contar desde la fecha de la administración, y para el caso de no formular Cintrón Hermanos sus reparos en los términos expresados, se obligaban á conformarse y á estar y pasar por el resultado de la contabilidad del Banco.

Esas cuentas, fueron rendidas por el Banco, y en 28 de Enero de 1901 arrojaban un saldo á su favor de 17,810 dollars 67 centavos; en 30 de junio del mismo año, otro saldo á favor del mismo Banco de 11,723 dollars 44 centavos; en 31 de diciembre del propio año, otro saldo á favor del Banco de 26,353 dollars 60 centavos; y en 30 de Junio de 1902, otro saldo igualmente á favor del Banco de 14,606-69. Tales cuentas no fueron impugnadas por Cintrón Hermanos, quiénes, lejos de hacerlo así, prestaron á ellas su conformidad; y lo más notable aún, es que á esas cuentas no han hecho reparos concretos y justificados en su escrito de demanda, como lo exigía la índole franca del judicial debate, para que esos reparos hubieran sido contestados en tiempo oportuno, y este tribunal hubiera podido apreciar si el Banco procedió ó no con dolo en su administración, y si contrajo ó no responsabilidades exigibles.

No consta en autos si el Banco produjo cuentas de su

administración á Cintrón Hermanos desde el 30 de junio de 1902 hasta el 26 de mayo de 1903, en que cesó en la administración de la Central "Laura" para entrar en posesión de ella como dueño; y como esa posesión es nula, por haber sido nula la segunda subasta de la Central "Laura", y nula también la posesión derivada del auto nulo de adjudicación que la motivó, entendemos que la condición del Banco queda reducida á la de administrador de la Central "Laura", y en ese concepto debe producir cuentas á Cintrón Hermanos de su administración, á contar desde la fecha de las últimas que rindió.

No cabe que el Banco indemnizase á Cintrón Hermanos de daños y perjuicios causados por su administración, desde el 23 de mayo de 1900 hasta el 30 de junio de 1902, en que rindió sus últimas cuentas, ni que abone á Cintrón Hermanos los rendimientos producidos y debidos producir por esa administración, pues Cintrón Hermanos no han justificado, como era su deber, que hayan debido hacérsele más abonos de rendimientos que los que les hizo el banco en sus cuentas, las cuales fueron aprobadas. El juicio emitido por peritos se refiere á observaciones practicadas en la Central "Laura" en 12 de abril de 1904, y por tanto con posterioridad á la fecha en que el Banco tomó posesión de ella como adjudicatario, no pudiendo deducirse del estado que entonces tuviera, cual fuera su estado durante la administración del Banco.

Tampoco cabe indemnización de daños y perjuicios, y abonos de rendimientos producidos y debidos producir desde que el Banco, como adjudicatario de la Central "Laura", tomó posesión de ella en 26 de mayo de 1903, pues la sola nulidad de la segunda subasta, no motivada por dolo, sino por una errónea apreciación jurídica, no determina aquella indemnización, y para el abo-

no de los rendimientos producidos y debidos producir durante la posesión del Banco como adjudicatario, se hace preciso que rinda las cuentas correspondientes, á las cuales podrán oponer Cintrón Hermanos los reparos oportunos, con sujeción á lo estipulado en la escritura de 23 de mayo de 1900, pues dada la nulidad de la adjudicación, ha revivido el carácter de administrador que antes tenía el Banco, y en harmonía con ese carácter, tanto el Banco como Cintrón Hermanos, deben ajustarse á lo estipulado en la referida escritura de 23 de mayo de 1900, que es la ley para los contratantes.

Respecto del último pronunciamiento solicitado en la sentencia ó sea de que se ordene por peritos que designen las partes y un tercero que elija el tribunal en caso de discordia, se proceda á una liquidación de todos los créditos hipotecarios y comunes del banco contra Cintrón Hermanos, á fin de que, conocido su montante verdadero, se satisfaga á éste con los productos de los mismos bienes subastados, los que continuará administrando el Banco con sujeción á lo pactado en la escritura de 23 de mayo de 1900, á menos que otra cosa acuerden las partes en vista del resultado de esa liquidación, parécenos que tal liquidación es innecesaria, pues los créditos comunes del banco contra Cintrón Hermanos aparecen claramente definidos en la escritura de 23 de mayo de 1900, y los hipotecarios también constan en las escrituras de 29 de abril de 1885 y 19 de mayo de 1900; los abonos y cargos que deban hacerse á Cintrón Hermanos con motivo de la administración de la Central ''Laura,'' administración que tuvo por objeto el pago de un crédito enteramente distinto del hipotecario reclamado en el procedimiento de apremio, deben hacerse en la misma forma en que convinieron las partes en la cláusula 11a. de la escritura de 23 de mayo de 1900; y tampoco puede ser compelido el Banco á hacer uso de la facultad que se reservó de pe-

dir la administración de la Central "Laura" para el pago del crédito hipotecario reclamado, siendo como era potestativo en él el ejercicio de esa facultad.

Por las razones expuestas procede que confirmando en lo conforme y revocando en lo demás la sentencia por ambas partes apelada, se declare nulo el procedimiento sumario ejecutivo ó de apremio seguido ante la Corte de Distrito de Humacao por el Banco Territorial y Agrícola contra la Sociedad Agrícola é Industrial Cintrón Hermanos para el cobro de crédito hipotecario, desde la celebración de la segunda subasta verificada en Guayama el 17 de marzo de 1903, reponiendo dicho procedimiento al estado que entonces tenía, y se desestimen las demás pretensiones formuladas por la referida sociedad en su escrito de demanda, sin perjuicio de los derechos que le asistan respecto de las cuentas de administración de la Central "Laura," que debe rendirle el mencionado Banco á contar desde la fecha de la rendición de las últimas cuentas producidas, con arreglo á lo pactado por ambas partes en la escritura pública de 23 de mayo de 1900, entendiéndose las costas de ambas instancias sin especial condenación.

*Resuelto de conformidad.*

Jueces concurrentes: Sres. Presidente Quiñones, y Asociados Figueras y MacLeary.

El Juez asociado Sr. Wolf no intervino en la resolución de este caso.